**CLEVELAND TELECOMMUNICATIONS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–241C.

United States Court of Federal Claims.

Dec. 2, 1997.

Lisa A. Federici, Washington, DC, for plaintiff.

Thomas A. Coulter, Washington, DC. with whom was Assistant Attorney General Frank W. Hunger, for defendant. Sumara Thompson–King and Laura A. Henry, National Aeronautics and Space Administration, of counsel.

## ORDER

MILLER, Judge.

This case is before the court after argument on defendant's motion for summary judgment. The issues to be decided are 1) whether, pursuant to a firm fixed-price contract and an incorporated collective bargaining agreement, a government furlough period constitutes a "holiday" and 2) whether a contractor or the Government should bear the risk of the unforseen furlough and subsequent adverse arbitration decision requiring the contractor to pay premium wages for the "holiday."

## FACTS

The material facts are not disputed. On June 8, 1995, the National Aeronautics and Space Administration ("NASA") and the United States Small Business Administration awarded Cleveland Telecommunication Corporation ("plaintiff") a firm fixed-price Contract, No. NAS 3–27603, to provide the necessary steam plant services for the Steam Generation Plant (the "SGP") at the NASA Lewis Research Center ("LeRC"). SGP services were to be performed 24 hours a day for one year, with four one-year options. As of March 1996, 14 of plaintiff's employees were full-time and 6 were part-time. The continuous SGP operations required three shifts; 3 to 4 employees worked each shift.

The contract contained a Wage Determination from the Department of Labor that incorporated, as Attachment E, the Collective Bargaining Agreement (the "CBA"), already in place at LeRC, between the previous contractor and the employees.[1] The wage determination also required that LeRC employees on NASA contracts be paid wages and benefits according to the CBA.

As a result of an impasse in negotiations for federal appropriations, the Government furloughed all but essential federal employees from November 14, 1995, to November 18, 1995, and again from December 18, 1995, to January 8, 1996, a total of 26 days. Although LeRC technically was closed during the furloughs, plaintiff was required to maintain operations continuously at the LeRC steam plant and to perform the same services as before the furlough. All of plaintiff's employees were designated as essential workers; all regularly scheduled employees worked and were paid their regular hourly rate. All non-essential federal employees who were furloughed received their regular wages, as well.

On November 28, 1995 and January 8, 1996, plaintiff filed equitable adjustment claims with the contracting officer to recover $63,187.53, arguing that the premium holiday wages plaintiff was required to pay under Art. VII of the CBA were unanticipated expenses, constituting a constructive change for which plaintiff should be recompensed. After consolidating the claims, by letter dated March 28, 1996, the contracting officer issued a final decision denying both. The contracting officer stated that "[r]equesting the Government to pay additional costs for work that was clearly defined in the statement of work and already compensated for, is considered an unreasonable cost to the Government." The complaint charges that the contracting officer's final decision was arbitrary and capricious and without a rational basis.

Pursuant to an arbitration clause in the CBA, the Industrial Maintenance and Vending Machine Service Employees Local Union No. 416 and plaintiff subsequently arbitrated the issue of whether Art. VII of the CBA required plaintiff to pay employees premium pay for the 26 days of the furloughs. On April 7, 1997, the arbitrator issued an opinion. Interpreting the meaning of "holiday" under Art. VII, the arbitrator held that the furlough periods were shutdowns of short duration and thus qualified for holiday compensation. Plaintiff was required to pay an

---

1. The new CBA was between plaintiff and the Industrial, Maintenance and Vending Machine Service Employees, Local Union No. 416. According to plaintiff, in preparing its bid, it heeded the wage determinations incorporated into the contract by Federal Acquisition Regulation ("FAR") § 52.222–47, 48 C.F.R. § 52.222–47 (1996), entitled, "SCA Minimum Wage and Fringe Benefits Applicable to Successor Contracts Pursuant to Predecessor Contractor Collective Bargaining Agreements (CBA)."

award of $36,457.22, plus interest.[2]

On March 31, 1997, plaintiff appealed the contracting officer's final decision by filing its complaint in the Court of Federal Claims for $63,187.53, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (1994). Defendant moved for summary judgment, contending that, pursuant to the unambiguous firm fixed-price contract between plaintiff and NASA, the furlough periods did not constitute a holiday. Defendant argues that the contractor must bear the risk and responsibility of unforeseen costs on a firm-fixed price contract. Plaintiff counters that because the arbitrator construed the ambiguity of Art. VII of the CBA to treat the furlough period as a holiday—thereby obligating plaintiff to pay premium pay—the $63,187.53 in additional pay constituted a constructive change for which plaintiff should be recompensed.

## DISCUSSION

### 1. *Contracting officer's final decision*

In her final decision, the contracting officer quoted from, and relied upon, Federal Acquisition Regulation ("FAR") § 31.205–6(c), 48 C.F.R. § 31.205–6(c) (1997), entitled, Compensation for Personal Services, Labor Management Agreements. This section states that "costs are reasonable if, as applied to work in performing Government contracts, they are not determined to be unwarranted by the character and circumstances of the work or discriminatory against the Government." FAR § 31.205–6(c). The contracting officer concluded:

> [T]here were no new burdens, hardships or hazards to the contractor's employees.... [D]uring the furlough periods, the services required, time, and place of performance remained unchanged....
>
> ... The furlough period was not a holiday period. Section H of the contract, Paragraph H.4, NASA 18–52.242–72 Ob-

servance of Legal Holidays, defines all holidays and does not discuss furloughs. In addition, Article VII of the CBA was clearly meant to compensate employees required to work on holidays or other times when hazardous conditions exist.

> The services provided by CTC during the furlough period were exactly those that would have been required if the furlough had not occurred and personnel were not exposed to additional risks. Therefore, additional compensation is not warranted....

The Federal Circuit has held that the contracting officer's decision is reviewed *de novo*, precluding a presumption of the decision's correctness. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed.Cir.1994) (*en banc*) (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 23, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974)). "Thus, once an action is brought following a contracting officer's decision, the parties start in court or before the board with a clean slate." *Wilner*, 24 F.3d at 1402.

While the court agrees with the contracting officer's reasoning with respect to the meaning of ¶ H.4, the decision is unclear as to why ¶ H.4 controls. Therefore, the court will interpret the meaning of ¶ H.4 and evaluate the conflict between ¶ H.4 and Art. VII of the CBA, in light of Art. XV, the subordination clause of the CBA.

### 2. *Provisions of the contract and incorporated CBA*

■ Article VII of the CBA, "Holidays," enumerates 11 paid holidays [3] and includes unenumerated "day(s) observed as such [a holiday]." The clause elaborates:

> It is agreed that the phrase above, "or day(s) observed as such," means the day(s) on which the Government substantially reduces the normal activities at NASA Lewis Research Center, the Center is in a "holiday or weekend mode" and the Govern-

---

2. When overhead and other indirect additional costs, such as additional benefits, were added, the total amount paid was $63,187.53. Plaintiff seeks this amount, plus interest and costs, which represents the premium wages it paid for the furlough periods.

3. The holidays are New Years Day, Washington's birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, Christmas Day, Employee's birthday, and Martin Luther King Jr.'s birthday.

ment employees at NASA Lewis Research Center celebrate the holiday.

On days that are not enumerated in the first paragraph above, when because of special events or occasion, i.e., administrative holiday, inclement weather, or other acts of God, or situation restricting operations for short durations, the Government substantially reduces the normal activities at NASA Lewis Research Center because of the special occasion or event, the following provisions apply:

Any employee required to work on a holiday will receive holiday pay plus one and one half (1 1/2) times the regular hourly rate for the first eight (8) hours worked. The number of employees required will be restricted to the number essential to maintain services.

■ Ironically, before the arbitrator, plaintiff construed Art. VII as defendant does now—as not including the furlough periods as a "holiday." After losing in arbitration, plaintiff now argues that Art. VII is ambiguous and that, because the Government drafted the CBA,[4] the rule of *contra proferentem* dictates that any ambiguity must be construed against the Government. *See, e.g., J.W. Bateson Co. v. United States*, 196 Ct.Cl. 531, 543, 450 F.2d 896, 902 (1971) (applying doctrine of *contra proferentem* and citing other cases). Contrary to defendant's intimation, however, plaintiff's earlier position regarding the lack of ambiguity does not preclude it from taking the opposite view here.

A necessary prerequisite to the rule of *contra proferentem* is that the contract clause is ambiguous, *i.e.*, susceptible to more than one reasonable interpretation. *ITT Arctic Servs., Inc. v. United States*, 207 Ct. Cl. 743, 767, 524 F.2d 680, 692 (1975). In its reply brief, defendant argues that the relevant contract is that between plaintiff and NASA, not the CBA, and that ¶ H.4 unambiguously delineates "holidays." Paragraph

H.4, entitled, "Observance of Legal Holidays," states:

(a) The on-site Government personnel observe the following holidays: New Year's Day, Labor Day, Martin Luther King, Jr.'s Birthday, Columbus Day, President's Day, Veteran's Day, Memorial Day, Thanksgiving Day, Independence Day, Christmas Day.

Any other day designated by Federal Statute, Executive order, or the President's proclamation.

Paragraph H.4 is triggered because Art. XV of the CBA contains a subordination clause, which states:

All provisions of this Agreement are subordinated to the contract between the Government and [plaintiff] at NASA Lewis Research Center, and, in case of conflict provisions of the Government contract take precedence. . . .

Defendant contends that because the plain language of ¶ H.4 omits furloughs as holidays, and because plaintiff claims that under Art. VII furloughs are holidays, a conflict exists; therefore, defendant argues, ¶ H.4 is controlling under the subordination clause.[5] During oral argument plaintiff asserted that it was required to accept the CBA and for this reason any ambiguity of Art. VII should be construed against the Government, the putative drafter of the CBA. However, by accepting the CBA, plaintiff also agreed to be governed by Art. XV, the subordination clause, as well as Art. XIV, the arbitration clause. Assuming, *arguendo*, that Art. VII is ambiguous and can be interpreted to include a furlough period as a "holiday," this interpretation demonstrates a clear conflict between Art. VII and ¶ H.4. Because the two provisions are inconsistent with one another, the subordination clause gives precedence to the latter.

Paragraph H.4 leaves plaintiff virtually no room to argue that the furlough periods constitute a holiday, as the furlough was not

---

4. Technically, the Government and the prior contractor negotiated the CBA. As a successor contractor, plaintiff was required to pay wages and benefits to its employees in accordance with the same CBA. FAR § 52.222–47.

5. The subordination clause requires a conflict between CBA provisions and the government contract. A conflict only arises if the CBA and the government contract are in conflict, not when the parties' interpretations create one.

designated by federal statute, executive order, or presidential proclamation as a holiday.[6]

### 3. *Firm fixed-price contract*

The contract between plaintiff and NASA is a firm fixed-price contract for the continuous operation and maintenance of the Steam Generation Plant for one year. The FAR define a firm fixed-price contract as one that

> provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

FAR § 16.202–1.

The Supreme Court held long ago that " '[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered.' " *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) (quoted in *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1579 (Fed.Cir.1997)). Although few recent cases have dealt with claims for recompense under fixed-price contracts, the United States Court of Claims has "consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs." *ITT Arctic Servs.,* 207 Ct.Cl. at 763, 524 F.2d at 691 (citing *Sperry Rand Corp. v. United States,* 201 Ct.Cl. 169, 181, 475 F.2d 1168, 1175–76 (1973); *Aerojet–General Corp. v. United States,* 199 Ct.Cl. 422, 434, 467 F.2d 1293, 1300–01 (1972); *Rolin v. United States,* 142 Ct.Cl. 73, 82, 160 F.Supp. 264, 268–69 (1958)).

■ Arguing that the risk of an adverse arbitration decision rests with plaintiff, defendant cites *ITT Arctic Services.* Plaintiff in that case contracted with the United States Air Force to provide operation and maintenance services for the Distant Early Warning Line, a network of radar and communication installations in, among other places, Canada. The contract specified a preference for Canadian labor, to be paid in Canadian dollars. A "Wage Escalation" clause in the contract allowed the contract price to be modified in the event of labor cost increases "when required and approved by the Canadian Government." *Id.* at 750, 524 F.2d at 683. While the contract was in effect, the Canadian Government "unpegged" its fixed exchange rate vis-a-vis the U.S. dollar, causing the value of the Canadian dollar to rise, thus increasing plaintiff's labor costs in meeting its contractual obligations. Based on the Wage Escalation clause in the contract, plaintiff requested that the contracting officer adjust upward the price of its firm fixed-price contract. The court held that the Canadian Government's action allowing its dollar to float did not qualify for price modification under the Wage Escalation clause because plaintiff's labor costs were neither required nor approved by the Canadian Government. *Id.* at 761, 524 F.2d at 689–90.

Defendant would apply the holding in *ITT Arctic Services* to the instant case, in that "no direct Government action order[ed] a wage increase" as a result of the furlough. Def's Br. filed Nov. 10, 1997, at 7. Although *ITT Arctic Services* is not exactly on point, it provides the closest analogy to this situation in terms of the lack of government action to increase wages and the unanticipated nature of the furlough and the arbitration decision. Thus, much like bearing the risk of currency valuation changes, the contractor in a firm fixed-price contract assumes the risk of other unexpected costs, such as losing a subsequent arbitration proceeding. Although in this case the furlough itself was caused by the Government, the Government did not

---

6. Moreover, even were the court to apply Art. VII of the CBA, three criteria are required for a day to be observed as a holiday: 1) the Government substantially "reduces the normal activities" at LeRC; 2) LeRC is in "holiday or weekend mode;" and 3) the Government employees at LeRC "celebrate the holiday." The furlough fails the third criterion and possibly the second, as well.

**654**

cause plaintiff "to incur unforseen expenses performing the contract." *Rolin,* 142 Ct.Cl. at 81, 160 F.Supp. at 268. Plaintiff's payment of premium wages to its employees was not caused by an "act or omission upon the part of the Government," *id.,* but by the adverse decision of an arbitrator.

Plaintiff cites three Armed Services Board of Contract Appeals ("ASBCA") decisions in support of its argument that the premium pay costs constituted a constructive change for which plaintiff is entitled recompense. All of these cases are distinguishable in that the Government took actions to order or pressure the contractor to pay higher wages than those called for by the Government contract at the time. *See, Appeal of Space Age Eng'g, Inc.,* 72–2 BCA ¶ 9,636, 1972 WL 1744 (1972) (holding that Government's insistence that plaintiff pay employees additional 'conformed' compensation constituted change for which plaintiff was entitled compensation); *Appeal of Geronimo Serv. Co.,* 70–2 BCA ¶ 8,540, 1970 WL 1477 (1970) (holding that Government's exercise of option and changing of applicable wage determination entitled plaintiff to equitable adjustment); *Appeal of J.R. Cianchette,* 60–2 BCA ¶ 2,814, 1960 WL 614 (1960) (finding that contracting officer incorrectly required retroactive payment of wages, based on memorandum not intended to apply to plaintiff's contract).

At no point did the Government take a position, let alone insist, that plaintiff's employees should be paid premium wages for "holiday" work as a result of the furlough. Nor did the Government request or require any changes in SGP services—in scope, time, or personnel—during the furlough which could have increased plaintiff's wage costs. To avoid summary judgment, plaintiff must show that a government action directly caused the constructive change. Plaintiff contends that the Government's action was to require it to accept the CBA, containing Art. VII. However, as noted above, the CBA also contained the subordination clause, which indicates that ¶ H.4 should apply. Plaintiff has failed to demonstrate that the furlough period constitutes a "holiday" under ¶ H.4.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**